UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-11318-RGS

AYOBAMI YAYO, on behalf of himself
and all others similarly situated

v.

MUSEUM OF FINE ARTS and
SANDRA MOOSE

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT and
PLAINTIFF'S MOTION TO CERTIFY CLASS

June 26, 2014

STEARNS, D.J.

Plaintiff Ayobami Yayo alleges that defendants Museum of Fine Arts (MFA) and Sandra Moose, the President of the MFA Board of Trustees, failed to compensate him for a pay differential he earned by working late-night shifts as a Security Supervisor in violation of federal and state wage laws. He also alleges that defendants terminated his employment in retaliation for his assertion of an entitlement to the pay differential. Yayo moves to certify a collective action on the wage claims. Defendants move for partial summary judgment on the retaliation claim, the claims of putative opt-in plaintiffs Corey Tolbert and Gregory Collupy, and all claims against Moose.

## BACKGROUND

The MFA is a nationally and internationally renowned art museum with an extensive collection of priceless paintings, sculptures, and artifacts. Its Department of Protective Services is responsible for the safety of the museum, its collection, and its visitors and staff. Defs.' Stmt. of Facts (DSOF) ¶ 9. Protective Services is headed by a Director, who at all relevant times was Craig McQuate. *Id.* ¶ 4. Reporting to the Director are a Deputy Director, five Security Managers, four Security Supervisors, and roughly one-hundred and thirty unionized Security Officers.[1] *See* Luongo Decl. ¶¶ 4-7. The Director, Deputy Director, and the Security Managers are exempt, salaried employees. *Id.* ¶¶ 3-5. The Security Supervisors and Officers are non-exempt hourly employees. *Id.* ¶¶ 6 & 8.

In January of 2008, Yayo began working for the MFA as a part-time Security Officer. DSOF ¶¶ 3 & 12. In July of 2010, Yayo applied for and was promoted to the position of full-time Security Supervisor. *Id.* ¶ 13. His duties included supervision over approximately thirty Security Officers, and ensuring compliance with museum security policies and practices. *Id.* ¶ 15.

---

[1] Security Officers fall into two categories: Security Officer I's are primarily responsible for the galleries and the interior of the museum while Security Officer II's are generally responsible for the exterior of the museum. Yayo Dep. at 87:6-25.

In a typical week, Yayo worked from 4 p.m. to 11 p.m on Wednesdays, and from 9 a.m. to 5 p.m. on Thursdays, Fridays, Saturdays, and Sundays. *Id.* ¶ 14. When Yayo was asked to work additional hours, he was paid at time-and-a-half for hours over eight in a day, and in excess of forty over a week. *See* Tolbert Dep. at 79:5-16.

In the spring of 2012, Yayo noticed that the MFA's employee handbook stated a policy of paying non-exempt employees an additional 7% of shift wages for shifts beginning after 3 p.m.[2] Yayo Dep. at 153:11-15. He

---

[2] The policy states:

The Museum authorizes shift differential payments based on job category and the applicable shift being worked. Non-exempt hourly employees regularly scheduled to work the following shifts in their entirety will be paid a shift differential:

| Time | Differential |
|------|--------------|
| 3:00 pm to 11:00 pm | 7% |
| 4:00 pm to Midnight | 7% |
| 11:00 pm to 7:00 am | 10% |
| Midnight to 8:00 am | 10% |

The differential is paid only when work is actually performed and will not be paid when an employee is on sick leave, disability, vacation, holiday, or any other absence. Shift differentials are included in the regular rate of pay for overtime purposes. With limited exceptions, exempt employees are not eligible for shift differentials.

Employees under contract are governed by the terms of their contracts.

Pl. Summ. J. Opp'n, Ex. B.

asked Security Manager Jerome Higgins and Operations Manager Kelly Meighan about his entitlement to this pay differential. DSOF ¶ 73. Higgins and Meighan agreed with Yayo that, as a non-exempt employee, the pay differential policy should, on its face, apply to him. Yayo Dep. at 231:7-11. Yayo then approached McQuate with the same question. *Id.* 231:12-15. McQuate also did not know why Yayo was not paid the shift differential for his qualifying shifts and agreed to pursue the matter. *Id.* at 231:22-232:8.[3] McQuate did not follow up with Yayo, and Yayo did not inquire about the shift differential again until September of 2012.

On August 29, 2012, Yayo worked the 4 p.m. to 11 p.m. shift as usual. DSOF ¶ 31. He invited two personal friends to visit him towards the end of his work day to fill out applications to work at the MFA and to give him a ride home afterwards. *Id.* ¶ 32; Yayo Dep. at 177:25-178:20. Yayo's friends arrived around 8 p.m. and entered the museum through the public entrance on Huntington Avenue.[4] Yayo Dep. at 179:11-25. They met with

[3] Yayo also testified that he had a brief follow-up conversation with McQuate about a week later in which McQuate again agreed to look into the issue. Yayo Dep. at 232:19-233:1.

[4] Yayo contends that this fact is contested because the MFA, in a November 9, 2012 submission to the Massachusetts Commission Against Discrimination (MCAD), stated that it could not at that time determine whether the visitors entered through the public or the staff entrance. Pl.'s

Yayo at around 9:40 p.m., just before the museum closed.  *Id.* at 180:5-8.

He brought them down a back staircase to the Protective Services Suite,

which was unoccupied at the time, and left them in the conference room

while he finished his closing duties.  DSOF ¶¶ 34-36.  Yayo returned to the

Protective Services Suite and joined his friends some twenty minutes later.[5]

*Id.* ¶ 37.

In early September of 2012, Yayo again raised the issue of the pay

differential again with McQuate.  Pl.'s Summ. J. Opp'n, Ex. A at MFA 285.

McQuate again agreed to look into the matter.  *Id.*  Yayo then approached

Lynn Hyams, a Human Resources (HR) Representative.  *See* DSOF ¶¶ 78-

79.  Hyams referred the matter to Maureen O'Reilly, an HR Senior

Manager.  *Id.* ¶ 80.  Sometimes in mid-September, O'Reilly informed Yayo

that she was still pursuing his query, and would get back to him.  Yayo Dep.

at 238:19-239:19.

---

Summ. J. Opp'n, Ex. A, Dkt. # 39-2 at MFA 283.  However, Yayo, who has
more direct knowledge of the incident, testified at his deposition that his
friends entered through the public entrance.

[5] Corey Talbot, a Security Manager, entered the Protective Services
Suite after Yayo's friends had been present in the conference room for
about fifteen minutes, but did not speak with them.  *See* Getchell Decl. Ex.
A.

In late September of 2012, McQuate learned that Yayo had left personal friends unsupervised in the Protective Services Suite and began an investigation. DSOF ¶ 51. The Protective Services Suite contains the most confidential security equipment and files pertaining to the MFA, including computer systems, keys, cameras, surveillance equipment, museum schematics and diagrams, security codes and passwords, employee personnel files, and other restricted information. *Id.* ¶ 23. The Suite is not accessible to nearly all MFA staff, including Security Officers. *Id.* ¶¶ 21-22. McQuate concluded that Yayo had gravely compromised the security of the museum and had violated the MFA's Visitor Access Policy.[6]  *See* DSOF ¶¶ 38-43. McQuate informed Katherine Getchell, the Deputy Director of the museum responsible for Protective Services, and recommended that Yayo be disciplined with a Final Written Warning. *Id.* ¶¶ 53 & 57. Getchell disagreed with McQuate's recommendation – she responded that Yayo had committed a "terminable offense" –

> We can't have a situation where command center has to spend time babysitting our own security management. There is no room for bad judgment in any case, security in particular. All of this reinforces that our biggest issue is with management – if

---

[6] The Visitor Access Policy requires that all visitors to staff-only areas of the MFA enter through the staff entrance, sign in with the Protective Services Guard on duty and obtain a visitor badge, and then be escorted at all times while in secure areas. DSOF ¶¶ 26-28.

we can't manage our managers, how do we expect our guards to behave? I support a 0% tolerance policy. We need to hold high standards and set examples.

Getchell Decl. Ex. B. Getchell, after consulting with McQuate and O'Reilly, ultimately decided to terminate Yayo. DSOF ¶¶ 58-60. Yayo's last day at the MFA was October 10, 2012. *Id.* ¶ 61.

Yayo filed this lawsuit in Suffolk Superior Court in April of 2013, on behalf of himself and all others similarly situated. Yayo asserts claims for non-payment of the differential wages for qualifying regular and overtime hours under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. (Count I), the Massachusetts Weekly Wage Act, Mass. Gen. Laws ch. 149, §§ 148 & 150, and the Massachusetts Minimum Fair Wage Law, Mass. Gen. Laws ch. 151, §§ 1A & 1B (Count II). Yayo also asserts a claim for retaliation in violation of 29 U.S.C. § 215(a)(3), and Mass. Gen. Laws ch. 149, § 148A (Count III). Defendants timely removed the lawsuit to this court on the basis of federal question jurisdiction. Discovery closed on April 14, 2014.

## MOTION TO FACILATE § 216(b) NOTICE

The FLSA permits a plaintiff to maintain an action "for and in [sic] behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the

court in which such action is brought." 29 U.S.C. § 216(b). Although a collective action under § 216(b) provides similar advantages in efficiency as a class action under Fed. R. Civ. P. 23, there are several important differences. *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 359 (D. Me. 2010).

> A significant distinction [] is that potential plaintiffs in an FLSA collective action must "opt in" to be included, while persons fitting the definition of a Rule 23 class must "opt out" to be excluded. The FLSA also does not incorporate Rule 23's numerosity, commonality, typicality, and adequacy criteria for class certification. It requires only that collective action plaintiffs be "similarly situated." 29 U.S.C. § 216(b). Thus, the FLSA allows plaintiffs to proceed collectively based on a lesser showing than that required by Rule 23.

*Id.*

District courts in the First Circuit have generally adopted a "two-tiered" approach to certification of collective actions under the FLSA. *See, e.g., id.,* at 364; *Kane v. Gage Merch. Servs., Inc.,* 138 F. Supp. 2d 212, 214 (D. Mass. 2001); *Reeves v. Alliant Techsystems, Inc.,* 77 F. Supp. 2d 242, 246 (D.R.I. 1999).

> Under the two-tiered framework, [t]he first stage determines whether notice should be given to potential collective action members and usually occurs earlier in a case, before substantial discovery, based only on the pleadings and any affidavits which have been submitted. The second stage occurs at the completion of discovery when the employer may move to decertify the class action. At the second stage, the Court is

tasked with making a factual determination as to whether there are similarly-situated employees who have opted in.

*Johnson v. VCG Holding Corp.*, 802 F. Supp. 2d 227, 233-234 (D. Me. 2011) (internal quotation marks and citations omitted).

At the first stage, "the plaintiff has the burden of showing a reasonable basis for [his] claim that there are other similarly situated employees. In other words, the plaintiff must make a modest factual showing that [he] and other employees, with similar but not necessarily identical jobs, suffered from a common unlawful policy or plan." *Prescott*, 729 F. Supp. 2d at 364 (internal quotation marks and citations omitted). At the second stage, however, "trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated." *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006). As the second stage typically follows the completion of discovery, "the court has much more information on which to base its decision and, as a result, [it] employs a stricter standard." *Id.* (citation omitted).

The parties dispute which of the governing standards should apply. Yayo, because he seeks to facilitate notice to potential opt-in plaintiffs, invokes the lenient first-stage standard. Defendants, on the other hand, argue that because discovery closed before Yayo filed his motion, the more stringent second-stage standard should apply. As the factual record is

complete and Yayo has already identified two opt-in plaintiffs,[7] the court sees nothing to be gained by delay and will proceed directly to the issue of whether the proposed collective action plaintiffs are in fact "similarly situated." *See Pfohl v. Farmers Ins. Grp.*, 2004 WL 554834, at *3 (C.D. Cal. Mar. 1, 2004) (proceeding directly to the second-stage determination after discovery); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (same). "Factors relevant to the stage-two determination include: factual and employment settings of the individual[ ] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *Prescott*, 729 F. Supp. 2d at 364-365.

Yayo proposes that the collective action plaintiffs include "all current and former security personnel over the last three (3) years immediately preceding the filing of the Complaint." Dkt. # 34. Four of the five categories of security personnel, however, are by definition excluded as collective action plaintiffs by the terms of the pay differential policy, which states on its face that it applies only to non-exempt employees. The

_____

[7] Cory Tolbert, a former Security Manager employed from January of 2007 to January of 2013, and Gregory Collupy, a former Security Supervisor employed from August of 2010 to September of 2012, have elected to opt-in as co-plaintiffs. *See* Dkt. # 20.

Director, Deputy Director, and the Security Managers are classified as exempt employees. Luongo Decl. ¶¶ 3-5. (The classification notwithstanding, Security Managers, including opt-in plaintiff Tolbert, are paid the differential for qualifying shifts. O'Reilly Decl. ¶ 5; *see also* Tolbert Dep. at 75:24-76:14). The terms and conditions of employment, including the entitlement to shift pay differentials, of non-exempt union Security Officers are governed by their collective bargaining agreement with the MFA. Luongo Decl. ¶ 8; *see also* Pl. Summ. J. Opp'n, Ex. B ("Employees under contract are governed by the terms of their contracts.").

Security Supervisors, however, are in the same "factual and employment setting" as Yayo. The MFA admits that Security Supervisors who worked the 3 p.m to 11 p.m shift prior to March of 2013[8] were not paid a shift differential despite being "arguably qualified for [it]." O'Reilly Decl. ¶ 6. This implicates common questions of fact and law – were the Security Supervisors entitled to the pay differential for qualifying regular and overtime shifts? And was any non-payment or delayed payment of the shift differential a violation of the FLSA and the Massachusetts wage laws?

Nonetheless, the MFA maintains that because it has different defenses requiring an individualized and fact-specific analysis of the

---

[8] This shift has since been abolished. O'Reilly Decl. ¶ 6.

situation of each putative plaintiff, a collective action is inappropriate. The MFA pays time-and-a-half overtime rates for hours worked in a day over eight hours, and also pays overtime rates for hours worked on holidays (in addition to regular pay for the holidays). Because neither is legally required, the MFA asserts that it can offset these premium payments against any underpayment of the shift differentials – a calculation that is unique for each employee, and may in some instances exceed the amount of the shift differential allegedly owed. Moreover, in February of 2014, the MFA issued checks to all former and current Security Supervisors who worked qualifying shifts from January of 2009 to March of 2013 for all outstanding shift differential wages, taking into account overtime hours.[9] Several recipients, including opt-in plaintiff Collupy, cashed these checks.[10] *See* O'Reilly Decl., Ex. B.

The MFA's argument fails to distinguish the issue of its liability from the issue of damages, if any. *See Lupien v. City of Marlborough*, 387 F.3d 83, 88-89 (1st Cir. 2004) (contractually paid overtime hours may shape the

_____

[9] That the MFA issued checks to these Security Supervisors is further evidence that they are similarly situated, at least with respect to the pay differential policy.

[10] The MFA did not present evidence that these checks were cashed in exchange for a release of claims.

12

remedy, but not necessarily the employer's liability). The issue of liability turns on whether the failure to timely pay shift differential wages violates the FLSA and Massachusetts wage laws, and not on any potential offset. The MFA's concerns for the complexities of determining individual remedies is also overblown – in any collective wage action, the remedy is necessarily determined based on an employee's individual circumstances such as hours worked, rates paid, and compensation already received.

Because Security Supervisors as a group are similarly situated to Yayo, the court will accept as a collective action plaintiff any Security Supervisor who worked shifts beginning after 3 p.m. in the three years preceding the filing of the Complaint. The parties will have until July 11, 2014, to jointly submit a mutually agreeable tailored notice[11] to potential opt-in plaintiffs for the court's approval.

## SUMMARY JUDGMENT MOTION

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although all reasonable

---

[11] Defendants object on various grounds to Yayo's current proposed notice.

inferences are drawn in the nonmovant's favor, the court cannot "'draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (emphasis in original), quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007). "This is no less true in discrimination and retaliation cases where motive is at issue; a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Children's Place*, 740 F.3d at 796, quoting *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855-856 (1st Cir. 2008). However, "[i]t is elementary that at summary judgment a court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the same." *Chadwick v. Wellpoint*, 561 F.3d 38, 41 (1st Cir. 2009).

### Retaliation Claim under the FLSA and the Wage Act

The FLSA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3). Similarly, "[n]o employee shall be penalized by an employer in any way as a result of any action on the part an employee to seek his or her rights under the

wages and hours provisions of this chapter."  Mass. Gen. Laws ch. 149, §

148A.  To make out a claim for retaliation under the FLSA, Yayo must

make,

> at a minimum, a showing that (1) the plaintiff engaged in
> statutorily protected activity, and (2) his employer thereafter
> subjected him to an adverse employment action (3) as a reprisal
> for having engaged in the protected activity.  The third element
> is of pivotal importance in this case.  Under it, a plaintiff must
> proffer evidence from which a reasonable factfinder could infer
> that the employer retaliated against him for engaging in the
> protected activity.  In other words, the record must enable the
> trier plausibly to find that a causal connection existed *between
> the protected conduct and the adverse action.*

*Blackie v. State of Me.*, 75 F.3d 716, 722-723 (1st Cir. 1996) (internal

quotation marks and citation omitted, emphasis in original).[12]

If a plaintiff establishes this prima facie case, the three-stage

*McDonnell Douglas* framework applies, as it does in any case in which the

plaintiff does not have direct evidence of retaliatory animus.  Under

*McDonnell Douglas*, at the second stage, "the burden shifts to the

defendant to articulate a legitimate, non-retaliatory reason for its

---

[12]  *Compare* 29 U.S.C. § 215(a)(3) *to* Mass. Gen. Laws ch. 149, § 148A;
*see also Mole v. Univ. of Mass.*, 442 Mass. 582, 591-593 (2004) (plaintiff
asserting a retaliation claim under Massachusetts antidiscrimination law
must establish a prima facie case that "he engaged in protected conduct,
that he suffered some adverse action, and that a causal connection existed
between the protected conduct and the adverse action." (internal quotation
marks omitted)).

employment decision." *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973), burden shifting to a Title VII retaliation claim). "If the defendant does so, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.*

Yayo's prima facie case of retaliation fails because he cannot show causation.[13] Yayo argues that because he was fired shortly after he renewed his inquiry regarding the pay differential, he is entitled to an inference that his assertion of his right to the pay differential was the real explanation for his termination. "Temporal proximity can create an inference of causation in the proper case. But to draw such an inference, there must be proof that

---

[13] Defendants also contend that Yayo's inquiries regarding the pay differential do not qualify as "fil[ing] [a] complaint" under 29 U.S.C. § 215(a)(3) because he did not at any time accuse the MFA of violating the wage laws. "To fall within the scope of the antiretaliation provision, [an oral] complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011). Yayo counters that his inquires were "sufficiently clear" because he asked why he was not paid the differential to which he was entitled under the MFA's own employee policy, and he pursued his inquiry with management and HR, demonstrating that he in essence made a continuing "complaint" about nonpayment of wages. Because Yayo cannot establish causation or show that the reason given for his termination was a pretext, it is unnecessary for the court to resolve this dispute.

the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action." *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir. 2006) (citations omitted).

Yayo presents no such proof. Getchell, the Deputy Director responsible for Protection Services, made the decision to terminate Yayo. DSOF ¶ 59; Getchell Decl. ¶ 7. Getchell indisputably had no knowledge of Yayo's inquiries regarding the pay differential. Getchell Decl. ¶ 8. Yayo can only point to the MFA's response to the MCAD, in which it stated that McQuate referred Yayo's pay differential question to O'Reilly, an HR Senior Manager, and an unnamed "Deputy Director" of the museum. Pl.'s Summ. J. Opp'n, Ex. A at MFA 285. The MFA, however, has four Deputy Directors, one of whom (not Getchell) is responsible for Human Resources. *See* Pl.'s Summ. J. Opp'n, Ex. F. Because Yayo has produced no evidence warranting an inference that the Getchell "knew of the [his] protected conduct when [] she decided to take the adverse employment action," his prima facie case of retaliation fails.

Even assuming, *arguendo*, that Yayo can make out a prima facie case based on temporal proximity, he cannot meet his ultimate burden of persuasion. The MFA contends that it fired Yayo because he admittedly violated nearly every command of the Visitor Access Policy, thus

jeopardizing the museum's most closely held security information. *See* DSOF ¶¶ 38-42. Yayo, for his part, argues that the MFA's rationale is pretext because he had received exemplary performance reviews in the past, and because the MFA did not follow its own progressive Disciplinary Action Policy in terminating him. *See* Pl.'s Summ. J. Opp'n, Ex. G. However, the Policy explicitly states that "[t]here are circumstances when the Museum reserves the right to terminate an employee without going through the disciplinary process. The Museum reserves the right to do so after gathering the facts and determining that a violation is severe enough to warrant immediate dismissal." *Id.*

Importantly, Yayo has presented no comparative evidence that the MFA treated others who committed similarly severe breaches of security more leniently.[14] Tolbert, who observed Yayo's friends in the Protective Suite conference room, received a Final Written Warning and submitted an apology for his failure to take action when he observed Yayo's friends in the Protective Services Suite. *See* DSOF ¶ 62; Getchell Decl., Ex. C. The supposed comparable violations identified by Yayo are different in kind –

---

[14] Yayo suggests that the alleged severity of his violations is belied by the fact that the MFA did not take action until a month following the incident. However, it is undisputed that McQuate did not learn about the incident until late September, and that he undertook an investigation of the incident as soon as he did. *See* DSOF ¶ 51.

they concern employees of the MFA's on-site restaurant[15] brought in for special events who traversed the basement to access service areas – or in degree – the rare personal visitor without a badge, but always with a staff escort. *See* Tolbert Dep. at 105:13-114:21. Yayo does not identify any other instance in which a non-employee was given unfettered access to the Protective Services Suite.

Finally, Yayo suggests that McQuate, because he was aware of the pay differential issue for some time and could have, but did not, request a modest budget adjustment to cover the additional wages, had a motive to retaliate for Yayo's persistence in raising the issue. *See* Yayo Dep. at 157:3-158:9. This speculative theory overlooks the fact, among others, that Getchell, and not McQuate, made the decision to terminate Yayo, albeit based on information accurately reported by McQuate. Moreover, McQuate repeatedly opposed Yayo's termination and advocated that he be given a Final Written Warning instead. McQuate Decl. ¶¶ 10 & 13; *see also* Getchell Decl., Ex. A. Because Yayo has failed to raise a genuine dispute of material fact in support of his retaliation claim, summary judgment will be granted to defendants on Count III of the Complaint.

---

[15] The restaurant at the MFA is operated by Restaurant Associates, a third-party contractor.

## Claims of Cory Tolbert and Gregory Collupy

Because the court has found that Tolbert, as an exempt Security Manager who received shift differential wages, is not similarly situated to Yayo, his claims will be dismissed without prejudice.  *See Prescott*, 729 F. Supp. 2d at 365. ("If the court finds then that employees are not 'similarly situated' it will . . . dismiss the opt-in plaintiffs without prejudice."). Collupy's claims will, however, be considered as a part of the collective action.

## Claims as to Sandra Moose

Under the FLSA, whether an officer of a company is individually liable for violations is determined by a "context dependent 'economic reality' test that look[s] to the totality of the individual's level of involvement with the corporation's day-to-day operations, as well as their direct participation in creating or adopting the unlawful pay practices." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 47 (1st Cir. 2013).  The

> analysis focuse[s] on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits.  In addition to direct evidence of such a role, other relevant indicia may exist as well – for example, an individual's operational control over significant aspects of the business and an individual's ownership interest in the business.  Such indicia, while not dispositive, are important to the analysis because they suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to

compensate) employees in accordance with the FLSA. *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998) (citation omitted).

Defendants contend that Yayo has offered no competent evidence that Moose exercised operational control over the MFA's day-to-day activities. Moose avers that she is the President of the Board of Trustees of the MFA. Moose Decl. ¶ 2. The Board oversees the Director and other officers who manage the MFA's employees and volunteers, i*d.* ¶ 4, but neither participates in personnel decisions, *id.* ¶ 5, nor determines compensation for employees (other than the executive officers), or administers or implements payroll policies. *Id.* ¶ 6.

Yayo does not dispute that he has not presented any evidence with respect to Moose's "level of involvement" in compensating the MFA's employees, or that she played a role in his termination. However, Yayo argues that he has a claim against her because the Wage Act holds individually liable "*any officers* or agents having the management of such corporation" for wage violations. Mass. Gen. Laws ch. 149, § 148 (emphasis added). In this regard he notes that the MFA identified Moose as an officer in its Annual Report filed with the Secretary of the Commonwealth. *See* Pl.'s. Summ. J. Opp'n, Ex. J.

It is, however, undisputed that Moose is listed on the MFA's Annual Report because the Report requires identification of not only corporate officers, but also the museum's directors. Kerwin Decl. ¶ 3. Moose is listed as the voluntary President of the Board of Trustees and not as an officer of the MFA (a position she has never held). *Id.* Moreover, under the Wage Act, a corporate officer or manager is an employer only if she "controls, directs, and participates to a substantial degree in formulating and determining policy of a corporation." *Wiedmann v. The Bradford Grp., Inc.*, 444 Mass. 698, 711 (2005) (superseded by statute on other grounds, Mass. Gen. Laws ch. 149, § 150). Because Yayo has not identified any basis to assess individual liability against Moose, the claims against her will be dismissed.

## ORDER

Yayo's Motion to Faciliate § 216(b) Notice is <u>ALLOWED IN PART</u> as to the Security Supervisors who worked shifts beginning after 3 p.m. in the three year preceding the filing of the Complaint. The parties will have until July 11, 2014, to jointly submit a mutually agreeable and tailored notice to potential opt-in plaintiffs for the court's approval. Defendants' motion for partial summary judgment is <u>ALLOWED IN PART</u> as to Count III (retaliation), the claims of putative opt-in plaintiffs Cory Tolbert, and the

claims against Sandra Moose, and <u>DENIED</u> as to opt-in plaintiff Gregory Collupy.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE